FILED
04/11/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2018

## IN RE RODERICK R. ET AL.

**Appeal from the Circuit Court for Sevier County**
**No. 16-TM-2-II      Telford E. Forgety, Jr., Chancellor**

_____

**No. E2017-01504-COA-R3-PT**
_____

This is a termination of parental rights case. Upon the petition of the Tennessee Department of Children's Services, the trial court terminated the parental rights of both the mother and father of two children. Clear and convincing evidence supports each ground relied upon by the trial court and the trial court's conclusion that termination of both parents' parental rights is in the children's best interest. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Gregory E Bennett, Seymour, Tennessee, for the appellant Rodrick R.

Samantha A McCammon, Sevierville, Tennessee, for the appellant, Elisabeth R.

Herbert H. Slattery, III, Attorney General and Reporter; Brian A. Pierce Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Robert L. Huddleston, Maryville, Tennessee, Guardian Ad Litem for J.R. and R. R., appellees.

### OPINION

#### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In this appeal, we address the termination of the parental rights of Elisabeth R. ("Mother") and Roderick R. ("Father") to their two minor children, J.R. (born January 2010) and R.R. (born July 2008) (together, the "Children).

Father and Mother met in 2005 when they were both serving on active duty in the military. In 2010, Mother and Father were married and living in California where Mother was stationed at Camp Pendleton.[1] On April 6, 2010, Father was arrested after bringing J.R. to the hospital with severe injuries.[2] Father pled guilty to three counts of inflicting serious corporal injury upon J.R., and he was sentenced to serve a total of six years in the California Department of Corrections where he remained until his release on July 17, 2015. Sometime after the April 6, 2010 incident, Mother filed for divorce. As a result of the injuries inflicted during the incident that led to Father's convictions,[3] J.R. is permanently mentally handicapped, mostly wheel-chair bound, and extremely limited in his ability to speak.

In December 2012, Mother was discharged from the military and moved to Tennessee with the Children. The Tennessee Department of Children's Services ("DCS") first became involved with the Children in August 2014. Shortly after midnight on August 6, 2014, Sergeant Rebecca Cowan of the Sevierville Police Department was dispatched to Mother's apartment building in response to a noise complaint. Sergeant Cowan testified that when she arrived, Mother was outside in the parking lot, and she was talking to a ball, which she addressed as her "happy ball." Mother appeared disoriented and was not wearing shoes. When Sergeant Cowan approached Mother, she began yelling at the officer and attempted to run away. Based upon Mother's behavior, Sergeant Cowan testified that she decided to arrest Mother for disorderly conduct.[4] Once Mother was in the patrol car and had been informed that she would be going to jail, Mother told the officer that she could not leave because the Children were in her apartment alone. According to Sergeant Cowan, Mother refused to provide information identifying a possible relative or friend to temporarily take care of the Children. Mother continued to behave erratically, and Sergeant Cowan decided to call EMS rather than taking Mother directly to jail. EMS directed the officer to bring Mother to the hospital for further evaluation, and DCS took the Children into custody.

---

[1] It is not clear from the record whether Mother and Father wed before or after the birth of their first child. Father appears on R.R.'s birth certificate as well as J.R.'s birth certificate, and paternity is not an issue in this appeal.

[2] Father acknowledges that J.R. was diagnosed with shaken baby syndrome, but Father testified at trial that he caused J.R.'s injuries accidently by dropping J.R. down the stairs.

[3] Mother testified that J.R. sustained a double brain hemorrhage, three fractured ribs, a fractured clavicle, spiral fractures on his ribs, facial bruising, and a fractured mandible.

[4] Sergeant Cowan testified that Mother violently resisted arrest. Mother's repeated attempts to kick the officer were recorded on the patrol car's video recorder and made an exhibit in these proceedings.

On August 7, 2014, DCS filed a "Petition for Temporary Legal Custody and Ex Parte Order," seeking temporary custody and requesting that the trial court adjudicate the Children to be dependent and neglected. The petition averred that Mother remained under observation due to mental health concerns, but DCS had not yet been able to get in touch with Mother. On August 8, 2014, the trial court entered an emergency protective custody order, appointed a guardian ad litem for the Children, and set a preliminary hearing date for August 20, 2014. Mother did not appear at the preliminary hearing,[5] but she was represented by counsel. The trial court found probable cause that the Children were dependent and neglected and determined that the Children would remain in DCS's custody pending the adjudicatory hearing scheduled to take place on October 29, 2014.

On October 29, 2014, an adjudicatory hearing was held.[6] Mother appeared at the hearing and stipulated that she had "ongoing mental health concerns associated with PTSD from military service." The trial court adjudicated the Children to be dependent and neglected and ratified the permanency plan submitted by DCS with the permanency goals of "return to parent" or "exit custody to relative."

Mother participated in the development of the initial permanency plan. Among other things, the permanency plan directed Mother to "identify and address all mental health needs [by taking the following steps]: . . . (1) [Mother] will schedule a mental health assessment with a parenting component at the VA; (2) [Mother] will sign a release

---

[5] We have explained the differences between a preliminary hearing, an adjudicatory hearing, and a dispositional hearing in juvenile court proceedings as follows:

> The statutes and rules governing procedure in the trial courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings. The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. The Tennessee Rules of Evidence apply, and the trial court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence. The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused.

> As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Its function is to allow the trial court to decide whether the child should be removed from the parent's custody pending the adjudicatory hearing. The trial court is allowed to consider reliable hearsay in making its decision, and it can order the child removed from the parent's custody based on a finding of "probable cause" that the child is a dependent, neglected, or abused child.

*In re Audrey S.*, 182 S.W.3d 838, 874–75 (Tenn. Ct. App. 2005) (internal citations omitted).

[6] Father remained incarcerated in October 2014, but the record indicates that DCS mailed him a copy of the permanency plan. Father also received a summons to the dispositional hearing set for January 15, 2015.

with the VA for DCS to obtain a copy of the assessment and any recommendations; (3) [Mother] will follow all recommendations from the assessment." The permanency plan also directed Mother to maintain safe and suitable housing, provide proof of legal income, and attend all of the Children's doctor's appointments.

On January 15, 2015, a dispositional hearing was held. The trial court judge entered a no-contact order against Father. The trial court also found that Mother was making progress, but it determined that visitation would remain supervised. A letter from a clinical psychologist employed by the VA was filed with the trial court on January 15, 2015. The letter indicated that Mother was participating in counseling for her PTSD and taking her medications as prescribed.

On March 6, 2015, Mother participated in the development of a second permanency plan. On March 25, 2015, a permanency plan hearing was held, and the trial court entered an order titled "Permanency Hearing Order and Adjudication (adverse to Father)," which ratified the second permanency plan. The order also stated:

> [p]rogress toward resolving the reasons the [children are] in foster care has been made but the following barriers still exist: Mother has to eliminate safety concerns from the home, namely 1) secure firearms, 2) obtain suitable beds; and 3) declutter the household.

The court also noted that DCS was assisting Mother to achieve the permanency plan goals by making home visits to Mother's home and supervising those visits.

A third permanency plan was created on August 7, 2015, shortly before the trial court approved a trial home placement. The permanency plan directed Mother to continue taking her medications as prescribed and attending her weekly support group for PTSD. Because Mother appeared to be making progress towards the permanency goals, on September 9, 2015, the Children were returned to Mother's physical custody for a ninety-day trial home placement. DCS retained legal custody.

On November 23, 2015, DCS filed a "Motion and Notice Disrupting Trial Home Placement." The motion averred that events occurring on November 20, 2015 had compelled DCS to disrupt the trial home placement and return the Children to foster care. Specifically, DCS reported that Mother had displayed bizarre behavior in public which had led to her detention by military police, arrest, and involuntary commitment to a VA hospital. The motion explained that, "prior to [Mother's] arrest, [she] was observed at a mall in Knoxville acting erratically. [Mother] was seen speaking to a cat (as though it was a person); attempting to drag the cat by a leash—clearly choking the cat." The motion also reported that Mother had refused to allow DCS personnel to enter Mother's apartment to retrieve necessary medication and medical supplies for J.R. during her hospitalization.

On January 13, 2016, a hearing was held and the trial court entered a "Permanency Hearing Order and Preliminary Hearing on Disruption of Trial Home Placement." Once again, the trial court ordered Mother to execute a release form so that DCS could access her VA medical and mental health records. The trial court also added the permanency goal of "adoption" and removed the permanency goal of "return to parent" from the permanency plan. Mother objected to the permanency goal changes and continued to refuse to sign the necessary medical releases.

After a hearing on March 2, 2016, the trial court entered an "Adjudicatory Order on Disruption of Trial Home Placement." Mother stipulated that the trial home placement disruption was for just cause, and the Children were returned to foster care. Once more, the trial court ordered Mother to sign the necessary medical release forms so that DCS could obtain her health records from the VA. Eventually, Mother executed the release forms, but DCS was unable to obtain the VA records until November 2016.[7]

On March 3, 2016, DCS filed a petition to terminate Mother and Father's parental rights on multiple grounds. DCS retained a licensed clinical psychologist, Dr. Shannon Wilson, and sought to have Mother evaluated prior to trial. On July 14, 2016, the trial court entered an order titled, "Motion and Order to Allow Access to Records and Comply with Psychological Evaluation." Mother was ordered to cooperate with Dr. Wilson in the evaluation and to sign all necessary releases so that Dr. Wilson could access her records. Mother was evaluated by Dr. Wilson over three days in September and October of 2016; however, Dr. Wilson testified that she was never provided Mother's VA records.

Hearings were held on February 9, 2017 and May 24, 2017. Three DCS employees testified at the hearings: Seth Gilliam, Lynn Eggers-Bentley, and Jan Gardner. Mother, Father,[8] Sergeant Cowan, and Ronald C., Mother's character witness, also testified. DCS also submitted the depositional testimony of Dr. Wilson. The trial court did not credit Mother's testimony; however, the court placed "great weight" on the opinion of Dr. Wilson.

Dr. Wilson testified that Mother's testing revealed she "appears to be rather emotionally unstable and may behave in negative, unpredictable, and aggressive ways." Dr. Wilson found that Mother exhibited hostility and mistrust towards authority figures, and she was unwilling to admit to the existence of her problems. Dr. Wilson's analysis indicated that Mother exhibited several symptoms associated with post-traumatic stress disorder (PTSD), paranoid personality disorder, borderline personality disorder, and

---

[7] At trial in May 2017, Mother admitted that, despite the court's orders, she had revoked her release of the records in March or April of 2017 so that DCS could not obtain additional records before trial.

[8] Father was not present at either of the hearing dates, but he testified over the phone from California at both.

narcissistic personality. Ultimately, Dr. Wilson opined that she was confident Mother's mental impairments rendered her unable to serve as the Children's caregiver.

On June 28, 2017, the trial court entered an order terminating Mother's parental rights on the grounds of mental incompetence, abandonment by failure to establish a suitable home, and persistence of the conditions that led to the Children's removal. The trial court terminated Father's parental rights on the grounds of severe abuse and incarceration for child abuse with a sentence of two years or more. The trial court also concluded that there was clear and convincing evidence that termination of both parents' rights would be in the Children's best interest. Mother and Father timely appealed.

### ISSUES PRESENTED

Mother presents four issues for our review, which we have restated as follows:

1. Whether the trial court erred in terminating Mother's parental rights based upon the statutory ground of mental incompetence.

2. Whether the trial court erred in terminating Mother's parental rights based upon the statutory ground of persistence of conditions.

3. Whether the trial court erred in terminating Mother's parental rights based upon the statutory ground of abandonment by failure to establish a suitable home.

4. Whether the trial court erred in determining that termination of Mother's parental rights is in the best interest of the Children.

Father presents three issues for our review, which we have restated as follows:

1. Whether the trial court erred in terminating Father's parental rights based upon the statutory ground of severe child abuse.

2. Whether the trial court erred in terminating Father's parental rights based upon the statutory ground of imprisonment with a sentence of two years or more for abusive conduct against a child.

3. Whether the trial court erred in determining that clear and convincing evidence supports DCS's position that termination of Father's parental rights is in the best interest of the Children.

## STANDARD OF REVIEW IN TERMINATION PROCEEDINGS

Both the Tennessee and United States Constitutions protect a parent's fundamental liberty interest in the care, custody, and control of his or her children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Navada N.*, 498 S.W.3d 579, 590 (Tenn. Ct. App. May 23, 2016) (citations omitted). However, a parent's rights are not absolute, and the State, as *parens patriae*, has the authority to interfere when a compelling interest exists to prevent serious harm to a child. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

By setting forth specific grounds upon which termination proceedings may be initiated, our termination statutes identify the circumstances which indicate that the State's compelling interest in the welfare of a child may justify termination of a parent's constitutionally protected rights. *In re Navada N.*, 498 S.W.3d at 590. Thus, when DCS seeks to terminate a biological parent's rights to his or her child, it must prove two things. *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. Nov. 7, 2005). First, DCS must prove the existence of at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re Audrey S.*, 182 S.W.3d at 860. Second, DCS must prove that termination of the biological parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d at 860 (citation omitted). In light of these profound repercussions, Tennessee courts impose a heightened standard of proof—clear and convincing evidence—in the biological parent's favor. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). Both the grounds for termination and the best-interest conclusion must be established by clear and convincing evidence. *See In re Carrington H.*, 483 S.W.3d at 523 ("The best interest analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."); *In re Navada N.*, 498 S.W.3d at 590. "These requirements ensure that each parent receives the constitutionally required 'individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away.'" *In re Carrington H.*, 483 S.W.3d at 523 (quoting *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)). "Such evidence 'produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established.'" *Id.*

The heightened burden of proof in termination of parental rights cases also requires this Court to adapt the customary standard of review that we typically apply in an appeal from a bench trial. *See* Tenn. R. App. P. 13(d); *In re Audrey S.*, 182 S.W.3d at 861. First, we must review the trial court's factual findings *de novo* on the record, presuming the trial court's factual findings to be correct. *See* Tenn. R. App. P. 13(d); *In re Audrey S.*, 182 S.W.3d at 861. "Second, we must determine whether the facts either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *See In re Audrey S.*, 182 S.W.3d at 861 (citations omitted).

Because a trial court judge is able to observe the witnesses, their manner, and their demeanor when testifying, the trial judge is far better situated than we are to make credibility determinations. *In re Navada N.*, 498 S.W.3d at 591 (citations omitted). Accordingly, when the resolution of an issue in a case depends upon the truthfulness of witnesses, great weight, faith, and credit is afforded to a trial judge's determinations. *Id*.

DISCUSSION

## I. TERMINATION OF MOTHER'S PARENTAL RIGHTS

The trial court terminated Mother's parental rights based upon the grounds of parental mental incompetence, persistence of the conditions that necessitated the Children's removal, and abandonment by failure to provide a suitable home. The trial court also concluded that termination of Mother's rights is in the Children's best interest. Mother has appealed the trial court's findings as to each ground as well as the trial court's best-interest determination.

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to conduct our own review of the record to determine whether clear and convincing evidence supports each ground relied upon by the trial court. *See In re Carrington*, 483 S.W.3d at 523; *In re M.L.P.*, 228 S.W.3d 139, 144 (Tenn. Ct. App. 2007) ("As long as one statutory ground for termination is established by the facts in [the] case and termination is in the best interest of the [child], the trial court's decision will be sufficiently supported.") We will review all three of the foregoing grounds relied upon by the trial court to determine if at least one statutory ground is established, and if so, whether clear and convincing evidence supports termination of Mother's parental rights.

### A. Grounds for Termination

### 1. Mental Incompetence

The ground of parental mental incompetence is found at Tennessee Code Annotated section 36-1-113(g)(8), which provides:

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

As the statute makes clear, DCS bore the burden to establish both that Mother is presently unable to care for the Children and that it is unlikely that Mother will be able to assume the care of and responsibility for the Children in the near future because of her mental impairment. *See* Tenn. Code Ann. § 36-1-113(g)(8). In relying on this ground for termination, the trial court pointed out that Mother has been hospitalized and arrested due to her mental illnesses and aberrant behavior on several occasions. The court stated that "there's no question of [Mother's] mental illness . . . the record is replete with evidence of her significant diagnoses: post-traumatic stress syndrome, bipolar [disorder] . . . depression." In support of its conclusion, the trial court made the following additional findings:

After that trial home placement was disrupted due to [M]other's bizarre and inappropriate behavior, [M]other was confined again to a facility for treatment related to her mental illness. Since the disruption of the trial home placement, however; [M]other has continued to make decisions, which call her parenting into question: she has been in relationships with abusive men, at least one, and she has conceived another child with a registered sex offender. That child was born in February 2017. Mother says she discovered he was a registered sex offender in March, 2016 and moved out from his home a couple of months after that. But [DCS] filed its Petition to Terminate Parental Rights on March 3, 2016. In other words, [M]other continued residing with [the registered sex offender] even after she was aware that DCS was calling her competency into question.

Having carefully reviewed the record, we have determined that clear and convincing evidence supports termination of Mother's parental rights based upon her parental mental incompetence. As mentioned above, the trial court did not credit Mother's testimony, and placed "great weight" on the opinion of Dr. Wilson.[9] Because Mother was a live witness, we give significant deference to the trial court's determination that Mother lacks credibility. *See In re Navada N.*, 488 S.W.3d at 591. We also find Dr. Wilson's expert testimony persuasive. Dr. Wilson opined that Mother's "extremely variable and unpredictable" functioning rendered her unable to provide the predictability and stability that the Children need from their caregiver. In particular, Dr. Wilson expressed concern about Mother's prospects of parenting J.R. because he is non-verbal and would not be able to seek help if "things got really bad at home" or if Mother was not taking care of his basic daily needs.

Mother's own testimony reflected that her mental condition has rendered her unsuitable to serve as a caregiver to the Children. For example, Mother acknowledges that she has mental health problems, but "disagrees" with her diagnosis of bipolar disorder and believes her psychiatrist "overmedicated" her for two-and-a-half years during these proceedings. At trial, Mother testified that she has always taken her medication as prescribed and has never failed to follow through with her treatment recommendations; however, her VA records indicate that Mother told medical personnel on multiple occasions that she had not been taking her medication as prescribed. Moreover, a DCS case worker testified that Mother told her she was not taking her medications. Mother's failure to adhere to her treatment as directed by her doctors and her attempts to conceal her failure to the court indicate that she is not presently able and likely would never be able to care for the Children in a responsible manner.

Mother's history of bad judgment and precarious living situations also demonstrate her irresponsibility as a parent. Mother testified that Father physically abused her "thirty to forty times" beginning during her first pregnancy with R.R. She testified that she obtained an order of protection for herself in 2008, but failed to include the Children on the order of protection or take steps to protect the Children from Father, who eventually caused J.R.'s severe disabilities. Her testimony indicated that she is still unable to appreciate or acknowledge her role in allowing Father to injure J.R.

As reflected by the trial court's findings, Mother continued to exhibit poor judgment with respect to her living arrangements throughout these proceedings. Mother testified that her live-in boyfriend, Joshua F., became abusive approximately four months into their relationship which began in September 2014. However, Mother continued to reside with her alleged abuser until May 2015. Mother also testified that she continued to reside with another boyfriend, Matthew C., for several months after he informed her in

---

[9] Mother did not offer countervailing expert testimony.

February of 2016 of his status as a registered sex offender.[10] Mother gave birth to Matthew C.'s child in February 2017, and she admits that she attempted to hide her pregnancy from DCS personnel. At trial, when Mother was questioned concerning the depth of her knowledge of Matthew C.'s status as a sex offender, Mother abruptly got out of the witness stand and ran out of the court room.

In addition to establishing that Mother is presently unable to care for the Children, the record also reveals clear and convincing evidence that it is unlikely that Mother will be able to care for the Children in the future. When questioned by DCS's attorney about the prognosis of Mother's mental impairments, Dr. Wilson opined:

A: [S]he is extremely resistant to admitting any psychological problems or functional shortcomings (often to the point that she is blatantly dishonest about their existence), and is very suspicious of those who might be helpful to her during the process of overcoming these issues. As a result, it is unlikely that she will be able to make significant and lasting changes in her functioning that would be necessary in order for her to be an appropriate and reliable caregiver for her children.

Q: Doctor, can you state, as an expert in your field, within a reasonable degree of scientific certainty, that [Mother] is significantly impaired and incompetent to such a degree that she is not able to parent these children?

A: Based on what I've been able to review during the course of this evaluation, yes.

When Dr. Wilson was questioned by the Children's guardian ad litem, the following exchange occurred:

Q: Did [Mother] exhibit remorse about anything that's happened with anything—in any of her discussions with you?

A: No. She—her responses—in order for someone to feel remorseful, they need to first understand that they have a degree of responsibility in what happened, and I really don't think she's there. She had a lot of reasons for what happened, none of which involved her making a mistake.

Furthermore, Mother's behavior surrounding her November 2015 hospitalization serves as compelling evidence of her continued parental mental incompetence. Her VA records indicate that on November 20, 2015, Mother arrived at the VA hospital with her cat, a loaded gun, a knife, and mace, and informed medical personnel that she had not

---

[10] Matthew C. was convicted of sexual battery.

- 11 -

been taking her medications or sleeping during the past week (while the Children were in her physical custody). Mr. Gilliam, the Children's family case manager at the time, testified that Mother did not inform him she was being detained at the hospital, and employees of the Children's school were compelled to contact him when no one arrived to pick them up. After Mr. Gilliam called several VA hospitals and eventually located Mother, Mr. Gilliam testified that Mother acted like her hospitalization was "not a big deal" and asked him when she could pick up the Children from him. Mother also reported to hospital personnel that she had been experiencing "sporadic" homicidal ideation and using alcohol during the trial home placement. Despite the gravity of these reports, at trial Mother refused to admit she had failed to take her medications as prescribed and blamed the disruption of the trial home placement on the Children's school for calling DCS instead of Mother's friend.

Mother's continued refusal to acknowledge her poor judgment and the severity of her mental problems demonstrates that it is unlikely she will be able to remedy these problems in a way that would allow her to serve as a caregiver to the Children at this time or in the foreseeable future. Accordingly, we hold that clear and convincing evidence supports termination of Mother's parental rights on the ground of parental mental incompetence.[11]

## 2. Persistence of Conditions

Termination based upon the ground of persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

---

[11] Relying on *In re Keishael N.E.*, No. M2012-01108-COA-R3PT, 2013 WL 440061, at *6 (Tenn. Ct. App. Feb. 4, 2013), Mother argues that the trial court erred in terminating Mother's rights on this ground because DCS failed to make "reasonable efforts" to assist her in obtaining mental health treatment. As discussed in greater detail below, we disagree with Mother's characterization of DCS's efforts to assist her in this case. Moreover, the Supreme Court has expressly ruled that "reasonable efforts" are not an element that must be proved to terminate a parent's rights on every ground; although, the efforts of DCS may factor into the best interest analysis. *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[W]e hold that, in a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.")

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When "efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* (quoting *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). The purpose behind this ground in termination proceedings "is to prevent the child's lingering in the uncertain status of foster child if the parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *Id.* (quoting *In re A.R.*, 2008 WL 4613576, at *20).

In concluding that DCS established the ground of persistence of conditions by clear and convincing evidence, the trial court relied on the evidence of Mother's instability and pattern of erratic behavior. Specifically, the trial court made the following findings:

> The conditions that led to the removal still persist: on or about November 19, 2015 Mother was experiencing a psychotic episode where she was detained by military police. She was found to be dragging a cat around a mall and speaking with the cat. Mother's mental incompetence, i.e. her inability to safely parent these children is the condition that persists in this matter. AND/OR [sic] Other conditions in the home exists that, in all reasonable probability, would lead to further neglect or abuse of the children: As has already been discussed, mother's housing has been precarious. She has moved to several different residences throughout the children's stay in foster care. Mother has resided with a man who was abusive and another boyfriend is on the sex offender registry. There is no way that these children could reside with her under those circumstances. At the February 9, 2017 hearing, [DCS] presented its concerns about mother's housing and unsafe conditions associated with a fire escape. Mother took almost three months to remedy that from that February 9, 2017 hearing

date, and did not make [DCS] aware of her changed circumstances until almost immediately preceding the May 24, 2017 hearing. Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable, and permanent home.

After carefully reviewing the record, we have concluded that clear and convincing evidence supports termination of Mother's parental rights based upon the ground of persistence of conditions. Six months has clearly passed since the Children's initial removal from Mother's home.[12] The condition, i.e. Mother's mental instability, that necessitated the Children's removal from Mother's custody and prevents their safe return clearly persists. As discussed in detail above, Dr. Wilson's opinion serves as compelling evidence that Mother is presently unable to responsibly parent the Children and will likely never be able to do so because of her mental illness and prognosis. Although Mother testified that she has pursued mental health treatment through the VA since 2012, she has not demonstrated that her parenting skills have improved or will likely improve in the near future, even with additional support.

Mother's lack of progress in improving her parenting abilities is exacerbated by her steadfast refusal to recognize her own shortcomings and tendency to place blame on others. Likewise, Mother continues to insist on downplaying the severity of her mental illness and the effects on the Children. For example, on the evening of August 6, 2014, when Mother was detained and hospitalized, Sergeant Cowan testified that she repeatedly asked Mother to provide information concerning the Children's location, identity, and a possible relative to come and get the Children. Even though the Children were alone and Mother had been informed that she was being arrested, Mother refused to provide any information concerning the Children's whereabouts, and the officer was only able to identify and locate the Children with the assistance of a neighbor. In November 2015, when Mother was hospitalized following the disruption of the trial home placement, she refused to give her landlord permission to allow Mr. Gilliam to access her apartment to retrieve J.R.'s gait trainer, medication, and leg braces. Mr. Gilliam testified that Mother refused to do so because she said "she didn't feel like the children would be out of her care long enough for it to really matter."

This record supports that Mother is unable to provide the stable, loving home environment the Children deserve. The continuation of Mother's involvement in their lives greatly diminishes their chances of integration into a safe and permanent home. Because there is no evidence that Mother has corrected the conditions that led to the Children's removal or that she has the ability to do so in the near future, we have

---

[12] The Children were removed on August 6, 2014 because Mother had to be hospitalized due to mental health concerns of the police. The Children were adjudicated to be dependent and neglected on October 28, 2014. The petition to terminate Mother's parental rights was filed in March of 2016, nearly nineteen months after the Children's initial removal from Mother's legal custody.

determined that termination of her parental rights is supported by clear and convincing evidence of persistent conditions.

### 3. Abandonment by Failure to Establish a Suitable Home

A parent's rights may be terminated if he or she has "abandoned" his or her child. Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *5 (Tenn. Ct. App. Aug. 22, 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 863; Tenn. Code Ann. § 36-1-102(1)(A)). The second statutory definition of abandonment provides that a parent may abandon his or her child by failing to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii).

Under this ground, it is important to recognize that "a 'suitable home' means more than just adequate physical space." *In re Saliace P.*, No. W2015-01191-COA-R3-PT, 2016 WL 304543, at *6 (Tenn. Ct. App. Jan. 26, 2016) (citations omitted). For example, a suitable home requires that the home be free from drugs and domestic violence. *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *9 (Tenn. Ct. App. Sept. 20, 2016) (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). In this context, "suitable home" means a safe and stable environment in which a child can live in the presence of a caregiver who can supply the care and attention a child needs. *In re Saliace P.*, 2016 WL 304543, at *6 (citing *In re Malaki E.,* No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)).

The trial court made the following findings in support of its termination of Mother's parental rights as to this ground:

> The Trial Court adjudicated the children dependent and neglected and placed them in DCS custody, pursuant to a petition filed in the Trial Court, after they were removed from Respondent's home on August 6, 2014. [DCS] could not make reasonable efforts to prevent removal due to the children's circumstances. In the nineteen (19) months since the removal, [DCS] has made reasonable efforts to assist the Respondent to establish a suitable home for the children by doing the following: the case manager and/or [DCS's] contract agency facilitated visitation for the mother; the case managers invited [Mother] to numerous child and family team meetings; Lynn Eggers-Bentley the prior case manager conducted home visits of [Mother's] home in advance of the trial home placement; [DCS's] contract agency and this case manager included [Mother] in doctor's appointments  and various therapies for the boys (physical therapy, occupational therapy, and speech therapy); [DCS] has included [Mother] in

- 15 -

IEP meetings for R.R.[.] In an attempt to make the children whole, [DCS] has provided for the children's extensive medical and therapeutic needs.

Clear and convincing evidence supports the trial court's conclusion that Mother failed to provide a suitable home for the Children. As discussed above, Mother's living arrangements have been precarious throughout these proceedings. Mother testified that after her hospitalization in August 2014, she moved in with her boyfriend Joshua F. Mother resided with Joshua F. until approximately May 2015, but the couple broke up because Joshua F. allegedly became abusive. Although Mother's testimony was somewhat unclear, the record indicates that she moved in and out of friends' homes over the course of the next couple of years, but allegedly had her own apartment during some periods. Mother testified that from February 2016 to April 2016 she resided with another boyfriend Matthew C. but moved out after discovering that Matthew C. is a registered sex offender. However, the testimony also indicated that Mother and Matthew C. conceived a child at some point after he informed her of his sex offender status. Mr. Gilliam testified that Mother may have purposefully rendered herself homeless at one point after the Children were removed from her custody. Specifically, Mr. Gilliam testified that Mother told him she was living out of her car voluntarily, in an attempt to make herself eligible for certain VA benefits available to homeless veterans; however, Mother denied making these statements. In addition to Mother's unacceptable choices in living arrangements, her mental illness has rendered her unable to provide a stable, safe home for the Children. Despite any efforts made by Mother, it is clear from the record that she has not created a suitable home environment for the Children.

However, our analysis with respect to this ground requires more than a determination that Mother failed to provide a suitable home. Although not all grounds for termination require a showing of "reasonable efforts" by DCS, the ground of abandonment by failure to provide a suitable home expressly *does require* DCS to demonstrate that "for **a** period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent[.]" Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added);[13] *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn.

---

[13] Our review of the case law has revealed that previous appellate decisions have had differing interpretations of the meaning of the "four month/reasonable efforts" requirement of this ground. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (requiring DCS to establish "for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents"). In some cases, this Court has held that DCS must establish that it made reasonable efforts in **the four month period immediately following** the child's removal from his or her parent's custody. *See In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *6 (Tenn. Ct. App. Jan. 18, 2018) ([T]his Court is limited to considering DCS's reasonable efforts for a period of four months immediately following the children's removal from the home."); *In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *5 (Tenn. Ct. App. Aug. 22, 2017). However, this Court has also held that DCS may meet this requirement if it establishes that reasonable efforts were made during **any four month period** following a child's removal. *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Sep. 20, 2016) ("According to the ordinary meaning of the statute, .

- 16 -

2015) ("[P]roof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home."); *In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *6 (Tenn. Ct. App. Jan. 18, 2018). "Reasonable efforts" are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family . . . [t]o make it possible for a child to safely return to the child's home." Tenn. Code Ann. § 37-1-166(g). Specifically, the statute requires DCS to prove three elements with respect to a four-month period: "(1) the parent has failed to make reasonable efforts to provide a suitable home, (2) DCS has 'made reasonable efforts to assist the parent ... to establish a suitable home,' and (3) the parent has 'demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.'" *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193, at *13 (Tenn. Ct. App. May 1, 2017) (quoting Tenn. Code Ann. § 36–1–102(1)(A)(ii)). However, DCS does not have to exhibit that it made "herculean" efforts. *Id.* (quoting *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. Nov. 8, 2012)).

On appeal, Mother avers that she has obtained suitable housing for the boys. Moreover, Mother argues that DCS did not make reasonable efforts, and "DCS should have taken affirmative steps to assist [Mother] with her mental health needs as this was the crux of the initial removal and disruption, and a continuing concern as noted throughout the record." According to Mother, DCS should not have relied on Mother to provide information regarding her mental health treatment and should have "set up mental health treatment prior to filing the petition to terminate parental rights."

In holding that DCS had proved this ground by clear and convincing evidence, the trial court described DCS's efforts as "heroic." Our review of the record likewise supports termination of Mother's parental rights on this ground. Following the removal of the Children, DCS attempted to assist Mother for well over a year before filing the petition to terminate her parental rights. Ms. Eggers-Bentley, the DCS case worker assigned to Mother's case from December of 2015 to May 2015, testified that among other efforts, she took the following actions to assist Mother: applied for funding and

---

. . the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal.'"); *State, Dep't of Children's Servs. v. V.E.F.*, No. M2008-01514-COA-R3-PT, 2009 WL 605146, at *4 (Tenn. Ct. App. Mar. 9, 2009).

We have determined that a plain reading of the statute indicates that DCS may establish this ground by offering proof of reasonable efforts during **any four-month period** following a child's removal for two reasons. First, the statute lacks the word "immediately," or any other word indicating such a restriction was intended by the legislature. Second, the statute states that DCS must establish that it assisted the parent for "a period" of four months—not "the period" of four months following a child's removal.

provided Mother with access to a parenting assessment; paid for a "very expensive" custom bed for J.R.; visited Mother's residence monthly; made recommendations as to how Mother could make her home suitable for the Children;[14] and invited Mother to all family team meetings, foster care meetings, and permanency plan meetings.

Mother now avers that DCS's efforts were not "reasonable" because DCS failed to assist her in obtaining additional mental health treatment. However, Mother's own refusal to cooperate by providing DCS with a release form so that DCS personnel could obtain her medical records from the VA significantly hindered DCS's employees' attempts to offer additional assistance to Mother. Ms. Eggers-Bentley testified that she attempted to set up mental health services for Mother, but Mother was ineligible for funding because she reported that she was already participating in extensive mental health treatment through the VA. Ms. Eggers-Bentley testified that she asked Mother to sign a release form on several occasions, but Mother's repeated refusals made it "very very difficult" for her to verify that Mother was indeed seeking mental health treatment through the VA. Accordingly, she testified that she did "the best that [she] could" to assist Mother with the information Mother was willing to provide. Mr. Gilliam, another DCS case worker, testified that, "[n]ot having those records caused us to feel around in the dark for what would be appropriate for her based on the limited information that she would give us and that we had." Even after the court ordered Mother (on three separate occasions) to execute a release form, Mother failed to cooperate for months.

Despite Mother's representations to DCS concerning her treatment, the record indicates that Mother approached her treatment with a cavalier attitude that exhibited a disregard for the Children. As discussed above, Mother told VA employees that she failed to take her medications as prescribed, resulting in at least one involuntary hospital commitment. "It is well established that the affirmative duty to make reasonable efforts is not solely on the Department." *See V.E.F.*, No. M2008-01514-COA-R3-PT, 2009 WL 605146, at *4 (Tenn. Ct. App. Mar. 9, 2009). "The duty to make reasonable efforts is 'a two-way street.'" *Id*. (quoting *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006)). Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Children and resulted in her inability to provide a suitable home environment. DCS's efforts were reasonable under the circumstances of this case. Clear and convincing evidence in the record supports termination on this ground.

### B. Best Interest Analysis

When at least one of the statutory grounds for termination of a parent's rights to his or her child has been established, the petitioner must then prove, by clear and

---

[14] When Ms. Eggers-Bentley visited Mother's house the first time, she observed several swords and between seven and nine assault rifles and hand guns. All of the guns were loaded and unlocked.

convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Navada N.*, 498 S.W.3d at 606 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994)). Not all parental misconduct is irredeemable. *See In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at * 8 (Tenn. Ct. App. Aug. 30, 2017). Accordingly, the statutes governing the termination of parental rights recognize that termination may not always serve the child's best interest. *Id*. However, when the interests of the parent and the child conflict, the courts must always resolve the conflict in favor of the rights and best interest of the child. *Id*. Tennessee law provides that a court may consider the following factors when determining whether termination of parental rights is in the child's best interest:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent and guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child, or another child or assault in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The factors enumerated above are not exhaustive, and "[t]he statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-PT, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002). In some cases, the consideration of a single factor, or facts outside the statutory factors, may dictate the outcome of the court's analysis. *See In re Miracle*, 2017 WL 3836020, at * 8.

The trial court made extensive findings concerning the relevant factors and concluded that termination of Mother's parental rights is in the Children's best interest. We agree. At trial, nearly three years had passed since the Children were originally placed in foster care. Mother has failed to make changes in her own conduct that would make it safe for the Children to return home and has continued to display a pattern of poor judgment and a disregard for the Children. For example, during the course of these proceedings Mother took the following actions: failed to take her medications as prescribed; repeatedly attempted to mislead DCS and the trial court; lived with one boyfriend whom allegedly became abusive; lived with another boyfriend who was a registered sex offender; conceived a child with the registered sex offender; and took a cat on a leash and a loaded gun to a hospital. The record supports the conclusion that Mother's psychological state would clearly be detrimental to the Children and would prevent her from effectively providing safe and stable care and supervision of the Children. Therefore, we affirm the trial court's decision that termination of Mother's parental rights is in the best interest of both of the Children.

## II. Termination of Father's Parental Rights

The trial court found that clear and convincing evidence supported termination of Father's parental rights on the grounds of severe child abuse and incarceration for child abuse with a sentence of two years or more. The trial court also found that termination of Father's parental rights was in the Children's best interest. Based on our review of the record, we affirm the trial court's termination of Father's parental rights.

### A. Grounds for Termination

#### 1. Severe Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides that a parent's rights to his or her child may be terminated if:

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

Tennessee Code Annotated section 37-1-102(b)(21)(A) defines "severe child abuse" as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

"'Serious bodily injury to a child' includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." *See* Tenn. Code Ann. § 39-15-402(d).

Father argues that the trial court erred in concluding that DCS established, by clear and convincing evidence, that Father committed severe child abuse resulting in J.R.'s diagnosis of shaken baby syndrome and permanent physical and mental handicaps. At trial, Father testified that J.R. incurred his injuries when Father accidently dropped J.R. down the stairs. However, Father acknowledges that he pled guilty to three counts of corporal injury upon a child in California.

We agree with the trial court that clear and convincing evidence supports termination of Father's parental rights based upon severe child abuse. The felony convictions in the record clearly indicate that Father pled guilty to three counts of

willfully causing corporal injuries to J.R., resulting in great bodily injury. Regardless of Father's attempts to explain the circumstances surrounding J.R.'s injuries, the fact remains that Father pled guilty to the atrocious crime that caused J.R. to suffer severe brain injuries, multiple broken bones, facial bruising, an inability to walk or sit up, and cognitive impairment resulting in J.R.'s inability to speak more than a few words at age seven. Accordingly, this Court finds that clear and convincing evidence supports termination of Father's parental rights based upon the ground of severe child abuse.

### 2. Imprisonment for Two or More Years for Severe Abuse

Tennessee Code Annotated section 36-1-113(g)(5) provides that a parent's rights may be terminated when:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian[.]

*See* Tenn. Code Ann. § 36-1-113(g)(5).

In his brief, Father avers that he "was not sentenced to more than two (2) years imprisonment for conduct against any child." Although the argument is somewhat challenging to follow, Father appears to argue that the sentence he received for child abuse does not meet the "two-year sentence" requirement of this ground because his sentence enhancement resulted in the addition of four years to his original two-year sentence, for a total six-year sentence. Furthermore, Father argues that the "enhancement is not identified by descriptive nature and the victim of that action or event is identified as [Mother]." Because Mother was listed as the victim, according to Father, the "trial court erred in finding that [he] had been sentenced to a period of more than two (2) years imprisonment for conduct against **any child**." (emphasis added).

We find Father's argument unpersuasive for two reasons. First, the statute states that "'sentenced' . . . shall be construed to mean that the court had imposed a sentence **of two (2) or more** years upon the parent." Tenn. Code Ann. § 36-1-113(g)(5). It clearly contemplates that a sentence for child abuse of exactly two years would be sufficient to trigger this ground. Father concedes in his brief that his conviction "clearly shows that

Father was sentenced to exactly two (2) years imprisonment." Second, we also find Father's argument that the conviction does not serve as clear and convincing evidence that his victim was indeed a child, namely J.R., unpersuasive. The record contains a certified copy of Father's conviction which indicates that Father pled guilty to corporal injury upon a child and was sentenced to two years imprisonment. On the same conviction, Father pled guilty to the enhancement found at California Penal Code section 12022.7(d), which states, "[a]ny person who personally inflicts great bodily injury **on a child** under the age of five years in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for four, five, or six years." (emphasis added). Father was sentenced to a total of six years for his crimes against J.R. We find that clear and convincing evidence supports termination of Father's parental rights on this ground.

## B. Best Interest Analysis

The trial court made findings concerning many of the best-interest factors and concluded that termination of Father's parental rights is in the Children's best interest. The record reflects that Father has not seen the Children since he was arrested in April 2010 for severely abusing J.R. He has no relationship with the Children because he has been incarcerated for the majority of their lives and has been forbidden by courts in California and Tennessee from contacting them. Accordingly, we hold that there is clear and convincing evidence in this record that termination is in the Children's best interest, and we affirm the termination of Father's parental rights to J.R. and R.R.

## CONCLUSION

The decision of the trial court is affirmed in all respects, and the case is remanded to the trial court for whatever further proceedings that may be required consistent with this decision. Costs of the appeal are assessed against the Appellants, Elizabeth R. and Roderick R. Because the Appellants are proceeding *in forma pauperis* in this appeal, execution may issue for costs, if necessary.

_____
ARNOLD B. GOLDIN, JUDGE